IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KEANE-ALEXANDER RON
CRAWFORD,
                  Petitioner,

    vs.


ARNALDO HERNANDEZ,
Superintendent, Spring Creek
Correctional Center,[1]

                Respondent.

No. 3:19-cv-00020-JKS

MEMORANDUM DECISION

Keane-Alexander Crawford, a state prisoner now represented by counsel, filed a Petition

for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Crawford is in the

custody of the Alaska Department of Corrections ("DOC") and incarcerated at Spring Creek

Correctional Center. Respondent has answered, and Crawford has not replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On December 7, 2008, Crawford was charged with the first-degree murder of his sister's

fiancé following a physical altercation between the two men. He was later indicted on charges

---

[1]    Arnaldo Hernandez, Superintendent, Spring Creek Correctional Center, is
substituted for Bill Lapinskas, former Superintendent, Goose Creek Correctional Center. FED. R.
CIV. P. 25(c).

of first- and second-degree murder and several related felonies in addition to misdemeanor charges of resisting arrest and fourth-degree assault.

Crawford asked to represent himself.  After obtaining a competency evaluation, the Anchorage Superior Court granted the request.  Shortly before trial was set to begin, a different judge of the Anchorage Superior Court, Judge Aarseth, to whom the matter had been re-assigned, held that Crawford was not competent to represent himself.  Crawford filed a petition for review, which the Court of Appeals granted, and the case was remanded for trial with Crawford representing himself.  During the pre-trial period, Crawford made a number of other motions, which will be discussed more fully in the Discussion section, *infra*, including a request for Judge Aarseth to recuse himself after a contentious pre-trial hearing.  Judge Aarseth denied the request.  A different judge of the Alaska Superior Court was appointed to review the recusal decision and found "no reason why Judge Aarseth should recuse himself in this matter."  At various times during the pre-trial proceedings, Crawford also asked the superior court to supply him, as an indigent criminal defendant, with public funds to hire a number of expert witnesses. The superior court denied Crawford's various requests.

On January 6, 2010, Crawford proceeded to trial.  At the conclusion of a five-week trial, the jury found Crawford not guilty of first-degree murder, but found him guilty of second-degree murder and several of the related charges.  The jury acquitted Crawford of, or were unable to reach a verdict as to, the remaining charges.

Again proceeding *pro se*, Crawford appealed his conviction, arguing that: 1) the trial court improperly denied his motion for sanctions based on malicious prosecutorial misconduct; 2) his rights to confrontation were violated by the trial court's denial of his request to cross-examine his sister at his bail hearing; 3) the prosecution's discovery violations infringed on his right to a speedy trial; 4) he was brought to trial outside the time limits of Alaska Criminal Rule Rule 45 (Alaska's speedy trial rule); 5) his Sixth Amendment right to a speedy trial was violated; 6) he was entitled to a new trial because Judge Aarseth should have recused himself; 7) the trial

judge improperly restricted his *voir dire* examination of prospective jurors; 8) the trial court improperly restricted or rejected Crawford's requests for an investigator, scientific testing, and a medical expert; 9) the trial court improperly denied Crawford's request to preserve his son's trial testimony by videotape; 10) the trial court violated his rights to due process, a fair trial, and confrontation by permitting the State to call without proper notice to Crawford an alcohol extrapolation expert; 11) the trial court erred in refusing to instruct the jury on the right to use deadly force in defense of self and third persons; 12) the trial court improperly denied Crawford's motion for a new trial; and 13) the totality of the errors constituted cumulative error warranting reversal of his conviction. The Alaska Court of Appeals unanimously affirmed the judgment against Crawford as to all claims except the superior court's refusal to provide an expert witness at public offense. *Crawford v. State*, 337 P.3d 4, 42 (Alaska Ct. App. 2014) (*"Crawford I"*). As to that issue, the appellate court solicited supplemental briefs from the parties as well as *amicus curiae* briefs from the Alaska Public Defender Agency and the Office of Public Advocacy. *Id.* Following supplemental briefing, the Court of Appeals held that: 1) the trial court was not required to provide public funds for expert witnesses Crawford requested; and 2) as a matter of first impression, the Alaska Public Defender Act, which guarantees legal counsel for indigent criminal defendants, does not authorize public funding of clerical support, investigative services, and expert consultations for indigent criminal defendants who have waived their right to appointed attorney representation. *Crawford v. State*, 404 P.3d 204, 223 (Alaska Ct. App. 2017) ("*Crawford II*"). The appellate court thus affirmed Crawford's conviction in its entirety. *Id.* Crawford filed a *pro se* petition for review in the Alaska Supreme Court, which was denied without comment on March 15, 2018.

Crawford then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court dated December 24, 2018. Docket No. 1; *see* 28 U.S.C. § 2244(d)(1),(2). After Respondent answered the *pro se* petition, this Court granted Crawford's renewed request for the appointment of counsel. Docket No. 12. Crawford filed an Amended Petition, Docket No. 19-1 ("Petition"),

which is now ripe for adjudication. Also pending before the Court is Crawford's request for an evidentiary hearing.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Crawford argues that: 1) the trial court violated Crawford's right to a speedy trial; 2) the trial court violated Crawford's right to due process when it declined to enforce Crawford's subpoena for the testimony of the victim's son (Crawford's nephew); 3) the trial court impermissibly limited Crawford's direct examination of Crawford's sister and other witnesses and wrongfully excluded certain impeachment evidence; 4) Crawford's right to confrontation was violated when he was denied the opportunity to call his four-year-old son to testify; 5) the Court of Appeals unreasonably applied federal law when it assessed his cumulative error claim based on the trial court's evidentiary rulings; 6) the trial court erroneously declined to give the jury a defense-of-others instruction; and 7) the trial court violated Crawford's rights to due process and a fair trial when it denied his request for funds to retain a medical expert.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly

-4-

established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

-5-

rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Crawford has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.    *Merits*

1.    *Speedy Trial Violation* (Ground 1)

Crawford first argues that the trial court violated his Sixth Amendment right to a speedy trial. On direct appeal, Crawford argued that the delays in bringing him to trial violated Alaska's speedy trial rule. The Court of Appeal considered and rejected that state law claim as follows:

> [Alaska] Criminal Rule 45(c)(1) provides that a criminal defendant must be brought to trial within 120 days from the date they were served with the charging document, but Criminal Rule 45(d) exempts various types of delay from this 120–day calculation.
> Crawford was arraigned and served with the charging documents on December 7, 2008, so the following day (December 8) was Day 1 of his Rule 45 calculation.
> The Rule 45 clock ran for 30 days, until January 6, 2009, when Crawford filed motions for a change of venue and for special consideration due to his indigency and *pro se* status. The filing of those motions tolled the running of the speedy trial clock. *See* Criminal Rule 45(d)(1).
> Crawford withdrew his motions on January 13th, but by that time there was an independent reason to toll the running of the speedy trial clock under Rule 45(d)(1): on January 8th, the superior court ordered Crawford to undergo a psychiatric examination to determine whether he was competent to represent himself.
> The report from that psychiatric examination was filed with the trial court on January 29th, but the report was inconclusive because Crawford had refused to participate in the examination. The court therefore ordered a second psychiatric examination, and this issue remained undecided.
> Moreover, Crawford filed several other motions on January 28th: motions for depositions of witnesses, to compel pre-trial discovery, to dismiss the indictment, and to sever the trials of the various charges against him—as well as renewed motions for a change of venue and for special consideration due to his indigency and *pro se* status.

-6-

While these motions were pending, Crawford filed a motion asking the trial court to order the Office of Public Advocacy to provide him with investigative assistance and with funds for expert witnesses. Crawford also asked the court to appoint private counsel for him. These motions became ripe for decision on February 25, 2009 (the day that Crawford filed his reply to the State's oppositions). This meant that the speedy trial clock would begin to run again 30 days later—on March 27th—unless the trial court ruled on the motions sooner. *See* Criminal Rule 45(d)(1).

The trial court ruled on the last of Crawford's motions on March 24th. However, the speedy trial clock remained tolled because the court had not yet ruled on the issue of whether Crawford was competent to represent himself. The court had received the report from the second psychiatric examination on March 11th—but, again, Crawford had declined to participate. So on March 25th, the court ordered a third psychiatric examination, and the speedy trial clock remained tolled.

The court received the report from the third psychiatric examination on April 16th. Based on that report, the court granted Crawford's request to represent himself on April 22nd.

With all pending motions resolved, the speedy trial clock began running the following day: April 23rd. This was Day 31 of the calculation.

Various pre-trial conferences and proceedings took place during the next several weeks, with the speedy trial clock running. The court set a final pre-trial conference for June 10th, and the court scheduled Crawford's trial for Monday, June 22, 2009.

June 22nd was 60 days after April 23rd (and April 23rd was Day 31). Thus, if Crawford's trial had begun on June 22nd, that would have been Day 91 for speedy trial purposes.

But on June 16, 2009, Crawford requested a five-day continuance of his trial. (Actually, Crawford's request amounted to a request for a seven-day continuance, because the scheduled trial date—June 22nd—was a Monday; the five days that Crawford was asking for would have ended on a Saturday.)

The court granted Crawford's request and rescheduled the trial for Monday, June 29th. This continuance stopped the running of the speedy trial clock at Day 85.

Then, on June 29th, Crawford asked the court for another continuance—or, in the alternative, dismissal of the charges against him—because he had not received all the pre-trial discovery he was entitled to. Thus, the speedy trial clock remained tolled at Day 85.

Three days later, on July 2nd, the trial court issued its ruling on the discovery question. The court found that the State had violated various pre-trial discovery orders, but the court found that the State's violations had not been willful. The court therefore denied Crawford's request to dismiss the charges, but the court granted Crawford's alternative request for a continuance of the trial. Specifically, the court ordered a month's continuance of the trial—until August 3, 2009.

On August 3rd (i.e., the scheduled trial date), Crawford asked the court to grant him another continuance to prepare and file motions and to obtain expert witnesses. Crawford agreed to delay his trial for three months—until November 2nd—for these purposes. The court granted Crawford's request.

However, on September 18th, Crawford informed the court that he was withdrawing his request for the remainder of this three-month continuance, and that he wished to go to trial as soon as possible. The court nevertheless maintained the November 2nd trial date.

On November 2nd, Crawford asked the court for public funds to transport various defense witnesses, including three young children. Crawford's motion led to hearings on the competency of the child witnesses. Crawford also filed a motion asking the court to

-7-

issue compulsory process so that Crawford could have access to a child witness, T.B., the homicide victim's son.

Because of Crawford's motions, and the resulting proceedings on those motions, the speedy trial clock remained tolled at Day 85.

On November 9th, the trial court concluded that Crawford was not competent to represent himself, and the court appointed the Public Defender Agency to represent him.

Because the court had not yet ruled on one aspect of Crawford's November 2nd motions (specifically, the competency of the child witnesses), the speedy trial clock was still tolled. But, in addition, the court expressly tolled the speedy trial clock for another 30 days—over Crawford's objection—to allow the Public Defender Agency to determine if there was a conflict that would prevent the Agency from representing Crawford, and (if not) to allow time for an assistant public defender to prepare for Crawford's trial.

That same day (November 9th), Crawford petitioned this Court to review the trial court's ruling regarding Crawford's competency to represent himself. This petition for review independently tolled the running of the speedy trial clock—because, until the issue of Crawford's competence to represent himself was resolved, the trial could not go forward.

On December 15, 2009, this Court granted Crawford's petition for review and overruled the trial court on the issue of Crawford's competence to represent himself. Crawford's case was returned to the superior court for trial, with the speedy trial clock still standing at Day 85.

Under *Sundberg v. State*, 667 P.2d 1268, 1270-71 (Alaska App.1983), when a case is returned to the trial court following this Court's resolution of a petition for review, the trial court has a 30–day grace period to work the case back into its trial schedule. Crawford's case returned to the superior court on December 16, 2009 (the day after we issued our ruling on Crawford's petition for review), and Crawford's trial began 22 days later—on January 6, 2010.

In sum: On the day that Crawford's trial began, the speedy trial clock stood at Day 85. Crawford was therefore brought to trial within the time limits of Criminal Rule 45.

*Crawford I*, 337 P.3d at 10-12.

Crawford additionally argued on direct appeal that the delay violated the Sixth

Amendment right to a speedy trial. The Court of Appeal rejected that argument as well:

As this Court acknowledged in *Alvarez v. Ketchikan Gateway Borough*, 91 P.3d 289, 294 (Alaska App.2004), there may be rare instances where, even though a defendant is brought to trial within the time limits of Rule 45, the delay in holding the defendant's trial still may have prejudiced the defendant to such an extent that the defendant's Sixth Amendment right to a speedy trial is violated.[FN2]

FN2. Citing *Deacon v. State*, 575 P.2d 1225, 1229 (Alaska 1978).

In *Alvarez*, we pointed out that the Alaska Supreme Court has held that an unexplained trial delay of 14 months or more is presumptively prejudicial,[FN3] while a delay of eight months or less is presumed to be non-prejudicial.[FN4] But in applying these rules, a court must exclude any periods of delay caused by the defendant.[FN5]

-8-

FN3. *Alvarez*, 91 P.3d at 294–95, citing *Rutherford v. State*, 486 P.2d 946, 951-52 (Alaska 1971), and *Glasgow v. State*, 469 P.2d 682, 688-89 (Alaska 1970).

FN4. *Id.* at 295, citing *Nickerson v. State*, 492 P.2d 118, 120 (Alaska 1971), and *Tarnef v. State*, 492 P.2d 109, 112-13 (Alaska 1971).

FN5. *Ibid.*, citing *Rutherford*, 486 P.2d at 952 n.15, and *Springer v. State*, 666 P.2d 431, 435 (Alaska App.1983).

Approximately 13 months elapsed between Crawford's arraignment in early December 2008 and the beginning of his trial in early January 2010. However, more than half of this delay was attributable to Crawford's various pre-trial motions and his petition for review. When the delays attributable to Crawford are subtracted from the total, only about six months of delay can be attributed to the State.

As we noted earlier, a delay of eight months or less is presumptively non-prejudicial. Thus, to prevail on his Sixth Amendment claim, Crawford must show that he was actually prejudiced by the six-month delay.

Crawford asserts that he suffered three kinds of prejudice. First, he argues that the delay kept him incarcerated, and away from his family, for 13 months. But we rejected this type of argument in *Alvarez*. The defendant in Alvarez argued that her pending case had caused her stress and had disrupted her life.[FN6] This Court held that, even if this claim was true, it did not entitle Alvarez to relief under the Sixth Amendment, in the absence of any showing that it prejudiced her defense.[FN7] Like the defendant in *Alvarez*, Crawford makes no showing as to how his separation from his family actually prejudiced his defense.

FN6. *Alvarez*, 91 P.3d at 295.

FN7. *Ibid*.

Crawford next argues that, during the delay, he was incarcerated and had no access to investigative or expert services. But though Crawford's incarceration may have hindered his access to investigators and expert witnesses, the delay did not hinder him.

Third and finally, Crawford argues that, because of the delay, some witnesses' memories were "greatly dimmed".

Crawford offers two witnesses as examples of memory loss. But one of these witnesses had difficulty remembering the details about the incident when he testified to the grand jury just two weeks after the shooting.

Although the second witness testified at trial that she could not remember if the homicide victim tried to strangle Crawford before Crawford shot him, there is no indication in the record that this witness had any such memory at any earlier time. And if, when the witness said that she could not remember the purported strangling, she was actually saying that she was unaware of this aspect of the occurrence, then this would not prove a loss of memory. The record does not otherwise show that the witness was ever aware of this purported happening.

In short, Crawford has not shown that he suffered actual prejudice from the approximately six months of delay that was not attributable to him. For these reasons, we reject Crawford's Sixth Amendment claim.

*Id.* at 18-19.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . .trial . . . ." U.S. CONST. amend VI. A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment and imposed by the Due Process Clause of the Fourteenth Amendment on the states. *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967).

The Supreme Court has not devised a *per se* rule to determine whether the right to a speedy trial has been violated. Instead, the Supreme Court has established a four-factor balancing test for evaluating whether a defendant's Sixth Amendment right to a speedy trial has been violated. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Accordingly, courts must apply a flexible functional analysis, and consider and weigh the following factors in evaluating a speedy trial claim: (1) "whether [the] delay before trial was uncommonly long," (2) "whether the government or the criminal defendant is more to blame for that delay," (3) "whether, in due course, the defendant asserted his right to a speedy trial," and (4) "whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992); *Barker*, 407 U.S. at 530. As the Supreme Court explained in *Barker*, none of the four factors are either a necessary or sufficient condition for finding a speedy trial deprivation. 407 U.S. at 533. They are related factors and must be considered together with such other circumstances as may be relevant. *Id.*; *see also Vermont v. Brillon*, 556 U.S. 81, 90-93 (2009).

To obtain habeas relief on a speedy trial violation claim, a petitioner must show that the state court's ruling on the claim was so lacking in justification that there was an error well-understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington*, 562 U.S. at 101. Moreover, "[b]ecause the *Barker* standard is a general, multi-factored standard, 'a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.'" *Taylor v. Roper*, 561 F.3d 859, 863 (8th Cir. 2009) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Here, the Alaska Court of Appeals concluded that all but six months of the delay was attributable to Crawford. *Crawford I*, 337 P.3d at 19. The appellate court therefore held that the delay was presumptively non-prejudicial, and because Crawford failed to show that the delay resulted in actual prejudice, he was not entitled to relief on his speedy trial claim. *Id.*

Crawford argues that the Court of Appeals unreasonably applied *Barker* when it concluded that the delays were largely attributable to Crawford. He contends that, because the "repeated delays" were attributable to the State, the entire length of the delay should be considered, and was presumptively prejudice to Crawford's defense. For the sake of argument, the Court will consider the entire 13-month delay, a length which has been held considered presumptively prejudicial. *See United States v. Murrillo*, 288 F.3d 1126, 1132 (9th Cir. 2012). The Court will therefore assume that the 13-month delay is sufficient to trigger review of the other three *Barker* factors, and balance the remaining *Barker* factors. *See Barker*, 407 U.S. at 530 (only if the delay is "presumptively prejudicial" need the Court inquire into the remaining *Barker* factors).

The second *Barker* factor asks "whether the government or the criminal defense is more to blame for that delay." *Doggett*, 505 U.S. at 651. The Court of Appeals' determination that all but six of the 13-month delay between Crawford's arraignment and trial was attributable to Crawford is neither unreasonable, nor contrary to federal law. An independent review of the record amply supports the Court of Appeals' determination that roughly seven months of the 13-month delay between his arraignment and trial "was attributable to Crawford's various pre-trial motions and his petition for review." *Crawford I*, 337 P.3d at 19. This factor therefore weighs in favor of the State.

Next, a petitioner's assertion of his speedy trial right is "entitled to strong evidentiary weight in determining whether the [petitioner] [was] deprived of the right." *Barker*, 407 U.S. at 531-32. Although the third factor—his assertion of his speedy trial right—weighs in favor of Crawford, even repeated assertions of a petitioner's speedy trial right "must be viewed in light of

-11-

[his] other conduct." *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986) (finding that defendants' repeated assertions of their speedy trial rights were contradicted by their filings of frivolous petitions in the appellate courts and of repeated and unsuccessful motions in the trial court, which contributed to the delay in their trial). Accordingly, in light of Crawford's numerous pre-trial motions and requests for continuances, the Court must give this factor minimal weight in favor of Crawford.

Finally, the Court considers whether Crawford suffered prejudice from the delay between arraignment and trial. Crawford argues that the delay: 1) negatively affected his personal life because he was incarcerated and separated from his family while awaiting trial; 2) denied him access to investigative or expert services; and 3) led the memories of eyewitnesses to be "greatly dimmed." But Crawford has not shown precisely how he was prejudiced by the delay between his indictment and trial. With respect to his claims that the delay affected his personal life and access to investigative or expert services, he does not explain what would have been different if he had been brought to trial sooner. Moreover, Crawford does not credibly point to any specific damage to his defense stemming from the post-charging delay in his trial. As the Court of Appeals reasonably concluded, Crawford failed to show how any purported memory loss was a direct result of the trial delay. *Crawford I*, 337 P.3d at 19. In light of the other factors, most importantly that Crawford was largely to blame for the lapse of time, the final *Barker* factor of prejudice does not support Crawford's claim.

In sum, although the full 13-month delay triggers an inquiry under *Barker*, that inquiry demonstrates that the majority of the delay was not attributable to the State, and Crawford has not established that he suffered prejudice from the delay. Accordingly, the state courts' rejection of Crawford's speedy trial claim was reasonable under *Barker*, and Crawford is not entitled to relief on this ground,

2.     *Evidentiary Errors/Confrontation Violations* (Grounds 2, 3, 4)

-12-

Crawford next contends that the trial court made various evidentiary errors that violated his rights to confrontation and to present a complete defense. The Supreme Court has made clear that federal habeas power does not allow a court to grant relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights. *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission [or omission] of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67). Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process violations for whether admission or omission of certain evidence "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005).

　　　　　a.　　　*Failure to enforce subpoena*

Crawford first argues that the trial court erred in refusing to enforce Crawford's subpoena of his ten-year-old nephew, Trevon. The record reflects that the Alaska Troopers had served a

-13-

subpoena for Trevon on his mother, Kerri Nichols, but she refused to accept it and would not reveal Trevon's location beyond stating that he was out of state for the duration of trial. The trial court refused to force Nichols to reveal her son's location and ruled that Trevon was "unavailable" as a witness for purposes of Alaska Evidence Rule 804(a).

On appeal, the Court of Appeals found that the trial court erred, concluding that "Crawford was entitled to have the superior court at least try to enforce his right to compulsory process." *Crawford I*, 337 P.3d at 21. It nonetheless held that the error was harmless:

> With regard to the timing of the events leading up to Crawford's shooting of Brown, several witnesses gave testimony concerning these events.
> Kerri Nichols initially testified that, after Crawford yelled for his children to get ready to leave the house, Brown accused Crawford of going for his gun, and then Brown pushed Crawford down onto a couch. But later in her testimony, Nichols gave a slightly different version: she said that Brown did not push Crawford onto the couch until later, after Crawford started to talk about "mind control".
> Another witness, Darryl Nicholson, testified that Brown tackled Crawford onto the couch, but Nicholson did not remember Crawford telling his children to get ready to go, nor did he remember many other details of the incident.
> Crawford's wife, Marie Huesties, testified that Crawford yelled at the children to get ready, and she then left the room to help them. Huesties said that she could then hear Kerri Nichols screaming at Brown to stop, and telling Brown that she did not want the children to "see [Crawford] like that".
> Crawford himself testified that he was trying to talk to his sister (Nichols) about things that had happened when they were children, and that Brown interrupted and told him to "shut [his] fucking mouth", and then Nichols yelled at Brown to stop. Crawford testified that Brown walked outside, but then Brown came back into the house and he (Crawford) could sense that something was different—and that was when he yelled at his children to get ready to leave.
> Crawford testified that the next thing he remembered was Brown hitting him, and he fell back onto the couch, and then Brown choked him until he was unconscious. Crawford said he could hear Nichols yelling at Brown, and that he saw Nichols trying to pull Brown off.
> Crawford's oldest son, Kenneth, testified that he came out of a bedroom and saw Brown choking Crawford, while Nichols was screaming and trying to get Brown off of Crawford.
> Arguably, Huesties's and Crawford's testimony—that the altercation occurred soon after Crawford yelled at his children to get ready to leave—was more probative than the testimony that Trevon could have offered, because Trevon was not in the room with Crawford, Brown, and Nichols, and he only reported what he heard through the wall. But Huesties and Crawford had a significant motive to portray events in the light most favorable to Crawford, while Trevon did not. (Trevon's father was the one who was killed.) So on this particular point, Trevon's testimony was arguably more probative than Huesties's and Crawford's testimony.
> Even so, it is difficult to see how the absence of Trevon's testimony might have influenced the jury's verdict.

-14-

Crawford's defense was that, when he shot Brown, he acted in self-defense and in a state of mental confusion because Brown had strangled him. The precise timing of the events we have been discussing—in particular, whether Brown became angry at Crawford after Crawford yelled to his children to put their coats on—was not important to Crawford's claim of self-defense. Rather, the critical component of Crawford's self-defense claim was his assertion that Brown strangled him to the point of unconsciousness, thus causing him to react in a mental haze.

Trevon was not in the living room with Crawford and Brown, and there is nothing in the record to indicate that Trevon would have been able to testify as to whether Brown did in fact strangle Crawford, and whether (as Crawford claimed) this strangulation brought Crawford to the point of unconsciousness.

Potentially, Trevon's testimony might have undermined Kerri Nichols's credibility as a witness; but this, too, seems doubtful. Trevon's description of what he heard through the wall can easily be reconciled with Nichols's initial testimony that, right after Crawford yelled at his children to get ready to leave, Brown accused Crawford of pulling a gun, and then he pushed Crawford down onto the couch.

We conclude that there is no reasonable possibility that the absence of Trevon's testimony affected the jury's decision in this case. Thus, the trial court's various errors with respect to this matter do not require reversal of Crawford's convictions.

*Id.* at 22-23.

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense; this right is "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). "However, that right is not unlimited." *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir.2002). Thus, a state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Crane*, 476 U.S. at 689-91 (discussion of the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"); *Greene*, 288 F.3d at 1090. In addition, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Drayden v. White*, 232 F.3d 704,

-15-

710 (9th Cir.2000); *see also Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir.2000); *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (plurality opinion suggesting that any justification by the state court for exclusion of evidence is sufficient to satisfy due process).

Respondent challenges the Court of Appeals' determination that the trial court erred in refusing to enforce the subpoena. But even assuming for the sake of argument that the decision was error, the Court of Appeals did not unreasonably apply or contravene federal law when it concluded that the error was harmless.

The harmless error rule arises from the principle that a defendant is entitled to a fair trial, but not a perfect one. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). The United States Supreme Court has clarified that, when a state appellate court has undertaken a harmless error review under *Chapman v. California*, 386 U.S. 18 (1967), the federal district court reviewing the decision under § 2254 applies the harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("*Brecht* obviously subsumes AEDPA/*Chapman* review"). Under *Brecht*, a federal habeas court that determines constitutional error occurred cannot grant a writ of habeas corpus unless the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638. Under the *Brecht* harmlessness analysis, "if a judge is in grave doubt" about the effect of the error on the jury, the petitioner must prevail. *O'Neal v. McAninch*, 513 U.S. 432, 438-39 (1995). Factors to consider regarding errors in limiting witness testimony include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

Upon independent review of the record, the Court agrees that Trevon's testimony was not likely to have altered the outcome of Crawford's case. For the reasons thoroughly and persuasively explained by the Court of Appeal, the Court is convinced that the exclusion of

-16-

Trevon's testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638. Crawford is thus not entitled to relief based on the exclusion.

b. *Limitations on cross-examination*

Crawford next contends that he was unfairly limited in his cross-examination of two witnesses, Kerri Nichols and Darryl Nicholson, who had testified during the State's case-in-chief. The Court of Appeal laid out the following background to this claim:

> During the defense case, Crawford called two witnesses—Kerri Nichols and Darryl Nicholson—who had already testified during the State's case-in-chief.
> During his direct examination of Kerri Nichols, Crawford sought to question her on topics that were within the scope of the prosecutor's earlier direct examination (when Nichols testified during the State's case). Crawford wanted to ask Nichols these questions because, by his own admission, he had forgotten to ask these questions during his earlier cross-examination of Nichols.
> The trial judge ruled that, because Nichols and Nicholson had both already testified during the State's case, and because Crawford had already had the opportunity to cross-examine these two witnesses on the topics covered during their earlier direct examination by the prosecutor, it would now be improper for Crawford to ask Nichols or Nicholson questions on any topic within the scope of their earlier direct examination. The judge limited Crawford's direct examination of these two witnesses to topics that either were new, or that arose only during their earlier redirect examination.
> The judge then invited Crawford to outline the specific questions that he wished to ask Nichols (the witness Crawford was examining at the time).
> With respect to most of Crawford's proposed questions, either the judge indicated that the questions were proper, or the prosecutor stated that he had no objection. However, the judge refused to let Crawford question Nichols regarding certain topics. In particular, the judge told Crawford that the following questions were within the scope of Nichols's earlier direct examination, and that it would therefore be improper for Crawford to:
>
> • seek to elicit Nichols's admission that, when the police interviewed her, she did not volunteer the information that Crawford was walking toward her while he was shooting—that Nichols only made this statement in response to an officer directly asking her, "Was he coming towards you?"
>
> • question Nichols concerning the grand jury testimony that she yelled at Nicholson to call 911; according to Crawford, this testimony was relevant to prove Nicholson's state of mind, by suggesting that Nicholson might have consciously hesitated to call 911, and that he might have had some motive for failing to do so immediately.
>
> • question Nichols about why she was "stressed out" that Crawford and his family were coming over to her house on the night of the shooting.
>
> In addition, the trial judge limited Crawford's direct examination of the second witness, Darryl Nicholson, in one respect.
> This issue arose because, during Crawford's earlier cross-examination of Nicholson (during the State's case), Crawford questioned Nicholson about some apparent inconsistencies between his statements to the police, his grand jury testimony, and his testimony on direct examination at trial—inconsistencies as to (1) whether Crawford pulled out his gun before or after Brown tackled him, and (2) Brown's reasons for

-18-

walking outside just as Crawford was leaving the house. When Crawford cross-examined Nicholson about these inconsistencies, Nicholson attributed them to his intoxication on the night of the shooting. Afterwards, the prosecutor asked Nicholson (during redirect examination) if he had a tendency to embellish things when he was intoxicated, and Nicholson said "yes."

When Crawford called Nicholson as a witness during the defense case, Crawford asked him a series of questions about this assertion that he embellished things when he was intoxicated. The prosecutor did not object to any of these questions, but the trial judge cut Crawford off, sua sponte. The judge mistakenly declared that Crawford's questions were "beyond the scope of the redirect." Crawford, however, did not challenge the trial judge's ruling, or point out that his questions were squarely related to testimony that Nicholson gave on redirect examination. Instead, Crawford moved on to a different topic.

*Crawford I*, 337 P.3d at 23-24.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. The right to cross-examine a witness includes the opportunity to show not only that a witness is biased, but also that the testimony is exaggerated or otherwise unbelievable. *Fowler v. Sacramento County Sheriff's Dept.*, 421 F.3d 1027, 1035 (9th Cir. 2005) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52 (1987) (plurality opinion)). In *Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992), the Ninth Circuit laid out a two-part inquiry to determine whether a petitioner's Sixth Amendment rights are violated by restricted cross-examination. The first inquiry is whether the evidence is relevant. *See id*. at 1550. If the evidence is relevant, the next inquiry is whether other legitimate interests outweigh the defendant's interest in presenting the evidence. *See id*. Hence, to show a restriction on cross-examination violates the Confrontation Clause, a defendant must demonstrate "'[a] reasonable jury might have received a significantly different impression of a [witness's] credibility had counsel been permitted to pursue his proposed line of cross-examination.'" *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1974)). A limitation on cross-examination "does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant." *United States v. Bensimon*, 172 F.3d 1121, 1128 (9th Cir. 1999) (internal citation and quotation marks omitted).

-19-

Under these guidelines, this Court cannot find that the restricted cross-examination was either unreasonable or contrary to federal law because, for the reasons explained by the Court of Appeals, Crawford fails to show that the proposed cross-examination questions would have led to materially relevant and otherwise unavailable evidence. *See Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983) ("Evidence of little importance, whether merely cumulative or of little probative value, will almost never outweigh the state interest in efficient judicial process."). As the Court of Appeal explained:

> With respect to the specific questions that Crawford unsuccessfully sought to ask Nichols, these questions did not concern issues that were central to the case, and they had no significant impeachment value. Indeed, one of Crawford's proposed questions (Crawford's attempt to elicit testimony that Nichols yelled at Nicholson to call 911) appears to have been aimed at a completely speculative purpose. And with respect to Nicholson's inconsistent statements, his self-admitted tendency to "embellish" when he was intoxicated, and his level of intoxication at the time in question, Crawford was able to apprise the jury of these things, both in his cross-examination of Nicholson during the State's case-in-chief and in his direct examination of Nicholson during the defense case (before the trial judge cut him off).
> For these reasons, we conclude that the trial judge's erroneous rulings did not rise to the level of infringing Crawford's right of confrontation, nor did these rulings appreciably affect the verdict.

*Crawford*, 337 P.3d at 25.

For the same reasons, Crawford cannot show that any alleged confrontation violation was anything more than harmless error. *See Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the Confrontation Clause is trial error subject to harmless-error analysis . . . because its effect can be quantitatively assessed in the context of other evidence presented to the jury." (citations and internal quotation marks omitted)). Again, a petitioner is not entitled to relief unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637. Crawford fails to show that either Nichols' or Nicholsons's testimony on the identified areas of questioning would have in any way swayed the jury in Crawford's favor. Crawford is therefore not entitled to relief on this ground.

c. *Exclusion of impeachment evidence*

Crawford similarly avers that the trial court erred in refusing to allow Crawford to impeach Nichols and Nicholson with certain impeachment evidence. The Court of Appeals considered and rejected this claim on direct appeal as follows:

> Crawford proposed to impeach Kerri Nichols by presenting the testimony of Nichols's adoptive father, Martin Nichols. According to Crawford, the senior Nichols would testify that Kerri had a character trait for creating conflict. Crawford argued that this character evidence was relevant to support Crawford's theory that Kerri had knowingly invited Crawford and Brown to her home for the purpose of orchestrating the conflict that led to the homicide.
>
> The trial judge ruled that the proposed evidence was not admissible under Evidence Rule 608(a), which states that the credibility of a witness may be attacked by opinion evidence, but only when that opinion refers to the witness's character for truthfulness or untruthfulness.
>
> Arguably, Crawford was offering Martin Nichols's testimony for a different purpose: not to attack Kerri's credibility as a witness, but rather to establish her actions on the night of the homicide (her alleged plan to bring Crawford and Brown together so that a conflict would erupt). But if the proposed character evidence was offered for this purpose, it was barred by Evidence Rule 404(a). Rule 404(a) codifies the general principle that evidence of a person's character is not admissible if it is offered as circumstantial evidence to prove that the person acted true to character on a particular occasion.
>
> Moreover, as the prosecutor pointed out when he opposed this evidence, even if it was true that Kerri Nichols invited Crawford and Brown to her home in hopes that they would argue or fight, this was not relevant to the central issue litigated at Crawford's trial: whether Crawford acted in self-defense when he shot Brown.
>
> For these reasons, we uphold the trial judge's decision to preclude this evidence.
>
> With respect to Crawford's proposed impeachment of Darryl Nicholson, Crawford wished to impeach Nicholson by playing the video recording of Nicholson's interview with the police shortly after the homicide; Crawford asserted that this video would show that Nicholson was not as intoxicated at the time of the homicide as he claimed.
>
> Before ruling on Crawford's request, the trial judge reviewed the video. Based on this review, the trial judge concluded that the video would provide a misleading view of Nicholson's level of intoxication, because Nicholson was sitting down for most of the interview (thus saving him from having to stand and maintain his balance). The judge also concluded that the video recording was not good enough to allow the jurors to assess the two main indicia of intoxication that the police interviewer relied on when he asserted that Nicholson was intoxicated: Nicholson's watery, bloodshot eyes and his odor of alcohol. In addition, the judge concluded that it would be difficult for the jurors to disregard the content of the statements Nicholson made on the video, and to focus solely on the indicia of Nicholson's sobriety or intoxication.
>
> These were all reasonable concerns, and we therefore conclude that the judge did not abuse his discretion when he refused to allow Crawford to play the video for this purpose.
>
> Crawford also asked the trial judge to let him impeach Nicholson in another fashion—by introducing evidence that, eleven years before, Nicholson's ex-wife had accused him of both physically and sexually assaulting her. Crawford argued that this

evidence was relevant to show that Nicholson was "capable of . . . perverted criminal acts"—thus supporting Crawford's theory that, on the night of the homicide, Nicholson instructed Brown to attack and restrain Crawford so that he (Nicholson) could then sexually assault Crawford's children.

Alaska Evidence Rule 404(b)(1) bars the admission of evidence of a person's other bad acts when the evidence is offered to prove (1) that the person characteristically engages in bad acts of that type, and (2) that the person therefore probably acted true to character during the episode being litigated.[FN11] Crawford's proposed evidence was prohibited by this rule.

FN11. *See Howard v. State*, 239 P.3d 426, 430 (Alaska App.2010).

Also, the trial judge ruled that even if it was true that Nicholson had sexually assaulted his ex-wife eleven years before, there was no reasonable connection between (1) the character trait arguably established by that earlier assault and (2) the events that Crawford alleged were occurring in the residence on the night of the homicide. In his brief to this Court, Crawford does not discuss this ruling or attempt to rebut it.

For these reasons, we uphold the trial judge's resolution of this issue.

*Crawford I*, 337 P.3d at 25-26.

Again, it is well-settled that a criminal defendant has a constitutional right to present a defense. *Crane*, 476 U.S. at 690. This right is not, however, without limitation. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n.6, (1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Most importantly, the Supreme "Court has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes."

-22-

*Nevada v. Jackson*, 569 U.S. 505, 511 (2013). And while the right to confront witnesses includes in some circumstances the right to discredit a witness through introduction of evidence of a prior crime, *see Davis v. Alaska*, 415 U.S. 308, 316 (1974),[2] the Confrontation Clause does not relieve a defendant of the requirements of the rules of evidence. As previously discussed, neither the confrontation clause nor the right to present a defense grants a defendant the unfettered right to cross-examine a witness on lines of inquiry that are marginally relevant or inadmissible. *Cf. Egelhoff*, 518 U.S. at 42; *see also Doughton v. Foulk*, 584 F. App'x 842, 842 (9th Cir. 2014) (rejecting claim that the trial court's exclusion of impeachment evidence against a prosecution witness violated his Sixth Amendment confrontation rights because "[t]he Supreme Court has never held that the Confrontation Clause entitles a defendant to introduce *extrinsic evidence* for impeachment purposes") (citation omitted). Accordingly, the state court's denial of this claim neither contravenes nor unreasonably applies Supreme Court authority, and Crawford is not entitled to federal habeas relief.

---

[2]     The Supreme Court's decision in *Davis* does not compel a different conclusion here. In *Davis*, the petitioner had been convicted of grand larceny and burglary following a trial in which the trial judge prevented defense counsel from cross- examining a key witness concerning his adjudication as a juvenile delinquent relating to a burglary and his probation status at the time of the events. *Davis*, 415 U.S. at 309-11. Defense counsel sought to introduce the witness's juvenile record on cross-examination not as a general impeachment of the witness's character but rather to show bias and prejudice against the defendant because the witness, who was then on probation, might have identified the defendant out of fear or concern that the police might believe he had committed the crime in issue, thereby jeopardizing his probation. *Davis*, 415 U.S. at 311. Following the affirmance of petitioner's convictions by the Alaska Supreme Court, the United States Supreme Court reversed and remanded, holding that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on the witness's testimony. *Id.* at 317. In particular, the court ruled that counsel should have been permitted to ask the witness not only "whether he was biased," but also "why [he] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318. The *Davis* Court emphasized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316-17. The proffered evidence here, however, does not share the probative value of the evidence at issue in *Davis*. Nicholson's alleged prior misconduct would be proffered here solely for general impeachment of his character and propensity to commit bad acts, and not to demonstrate bias or other motivation to lie.

-23-

d.    *Incompetency of Minor Witness*

Crawford further claims that the trial court erred in determining that his five-year-old son Joseph was incompetent to testify.  The Court of Appeal laid out the following background to this claim:

> During the second competency interview with Joseph (which took place during Crawford's trial), both the trial judge and Crawford himself asked Joseph a number of questions in an attempt to assess the boy's competency.  Joseph answered most (but not all) of these questions.  But with very few exceptions, Joseph's answers were monosyllabic "yes" and "no" answers.  Joseph gave his longest answer—"I didn't want to"—when Crawford asked Joseph if he had earlier expressed willingness to "[talk] on a camera".
>
> At the conclusion of this second interview, the trial judge found (and Joseph's answers demonstrate) that Joseph understood the difference between the truth and a lie—although we note that the trial judge never made a finding on the separate issue that is crucial for purposes of Evidence Rule 601: whether Joseph understood the duty to tell the truth.
>
> But despite the fact that the judge was satisfied of Joseph's ability to distinguish the truth from a lie, the trial judge again ruled that Joseph was not competent to testify. The trial judge stated, "I don't have . . . confidence that, when [Joseph] is communicating with us, . . . he is telling us . . . everything that might be there, or even [that he] is going to be answering the questions [at all]."

*Crawford I*, 337 P.3d at 31.

The Court of Appeal concluded that the trial judge's ruling was error because he "expressly found that Joseph's failure to meaningfully communicate was the result of his unwillingness, not any incapacity." *Id.*  The Court nonetheless found the error harmless:

> As we have explained, Crawford's defense to the homicide charge hinged on the assertion that the victim, Brown, choked Crawford to the point where Crawford lost his normal mental capacity, and then Crawford shot Brown a few minutes later in a state of mental confusion.
>
> Crawford's assertion that Brown choked him was corroborated by the testimony of Crawford's wife, Marie Huesties, and his oldest son, Kenneth Crawford.
>
> Huesties (testifying for the State) told the jury that Brown and her husband got into an argument in the living room while their three sons (Kenneth, Joseph, and Alex) were playing in a bedroom.  In the middle of this argument, Crawford yelled, "We're going to leave," so Huesties went to the bedroom to get the three children.
>
> While Huesties was helping the children put on their coats and boots, Huesties could hear some kind of altercation going on in the living room, with Kerri Nichols screaming at Brown.  Huesties testified that she hesitated to take the children into the living room, because she was scared.  But she finally took their hands and led them outside the house—going through the living room on their way out.  According to Huesties, as they passed through the living room, she saw Brown holding Crawford by the coat and "jerking him around" by the collar.  Crawford wasn't doing anything in response: his arms were by his side, his eyes were half-open, and he looked "out".

-24-

Huesties testified that the children were crying as she led them outside to the car. When they reached the car, Huesties realized that it was locked, and that Crawford had the keys. Crawford came out of the house a few moments later and unlocked the car. Huesties testified that Crawford did not sound like himself. Then someone came out of the house and yelled, "Hey, don't forget . . ."—at which point, Crawford pulled a gun and started shooting. Crawford paused, and then he started shooting again. When Crawford was done shooting, they all piled into the van, and Crawford drove away.

Kenneth Crawford (testifying for the defense) corroborated his mother's account of these events (as just described), except that he was more emphatic about Crawford's being choked. Kenneth testified that when he and his two brothers and his mother passed through the living room on their way out of the house, Brown was not just holding Crawford by the collar; rather, Brown was actively choking Crawford—both with his hands and with the crook of his arm.

Given this testimony, and given the fact that Crawford made no offer of proof that Joseph could add anything of substance to the testimony given by his mother and his brother, we conclude that even if the trial judge should have allowed Joseph to take the stand during the defense case, that error was harmless.

*Id.* at 31-32.

Crawford fares no better on federal habeas review. The Court of Appeals' harmlessness determination is both reasonable and fully supported by the record. It therefore precludes the grant of federal habeas relief as well.

      3.    *Cumulative Error* (Ground 5)

Crawford additionally avers, as he did on direct appeal, that the cumulative effect of the alleged evidentiary errors/Confrontation violations identified above deprived him of a fair trial and warrant reversal of his conviction. The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the

-25-

evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 401 U.S. at 298, 302-03). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

Here, the Court of Appeals rejected Crawford's cumulative error claim because "many of the alleged errors identified by Crawford were not errors at all" and, "with respect to the true errors that Crawford has identified, we conclude that those errors, even in combination, did not result in recognizable prejudice to Crawford." *Crawford*, 337 P.3d at 34. Because, as discussed more thoroughly above, the Court of Appeals did not err in finding only non-prejudicial errors in this case, Crawford does not demonstrate federal constitutional errors that would establish prejudice in the aggregate. *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). Crawford is therefore not entitled to relief on this claim.

    4.   *Instructional Error* (Ground 6)

Crawford further avers that the trial court violated his rights to a fair trial and due process when it declined to give the jury a defense-of-others instruction. The Court of Appeal considered and rejected this claim on direct appeal as follows:

> The trial judge refused Crawford's request to instruct the jury on the defense of "defense of others", *see* AS 11.81.340, and the judge likewise refused to allow Crawford to argue to the jury that he killed Brown while acting in defense of his wife and children.

Crawford's proposed defense is defined in AS 11.81.340. This statute declares that a defendant is justified in using force upon another person "when and to the extent the [defendant] reasonably believe[d] it [was] necessary to defend a third person". The statute further explains that this defense is established if, under the circumstances as the defendant reasonably believed them to be, the third person would have been justified in using that same degree of force in self-defense.

Under the self-defense statute, AS 11.81.335, a person is entitled to use deadly force to protect themself from kidnapping. Relying on this provision of the self-defense statute, Crawford argues that there was sufficient evidence to support a jury verdict in his favor on the issue of whether he reasonably believed that his wife and children were in danger of being kidnapped by Brown. Thus, according to Crawford, his wife and children would have been justified in using deadly force against Brown to defend themselves— and, under the "defense of others" provision of AS 11.81.340, Crawford would likewise have been justified in using deadly force against Brown.

But Crawford's theory of imminent kidnapping was not based on any action that Brown took against Crawford's wife and children. Rather, Crawford's theory of imminent kidnapping was based on the fact that Crawford had the keys to the family vehicle on his person. Crawford argued that, because he had the keys, Brown subjected Crawford's wife and children to unlawful restraint when Brown held Crawford down on the couch.

The trial judge ruled that this was not a valid theory of kidnapping—and that, in the absence of any other evidence that Brown subjected Crawford's wife and children to a restraint or a threat of restraint, Crawford was not entitled to a jury instruction on "defense of others", nor was Crawford entitled to argue this theory of the case to the jury.

On appeal, Crawford argues that there was some evidence from which the jury could have concluded that he reasonably feared that deadly force was necessary to protect his family from kidnapping. Crawford points to the evidence (1) that Brown assaulted him right after he yelled at his children to get ready to leave the residence; (2) that Kerri Nichols had lost control of events and could not stop Brown from strangling Crawford; and (3) that Crawford was disoriented and was having difficulty locating his family and assisting them to get in the van so they could leave.

But these assertions, even if true, do not establish a kidnapping as that offense is defined in AS 11.41.300(a).

More importantly, the primary difficulty in Crawford's "defense of others" claim is that, when Crawford testified at trial, he never said that he was afraid his family would be kidnapped. Instead, Crawford testified that Brown strangled him to the point where he was confused and barely conscious—and that, as a consequence, he feared for his own life.

On direct examination, Crawford testified:

> Crawford: I [saw Brown] coming out, and . . . I just remember thinking that, you know, I'm not—I'm not awake. I'm not—I can't stand up. I can't really see things. I can't breathe. And if he gets his hands around my neck again, I'm done [for], and that's probably what he's coming to do.

Crawford gave similar testimony when he was cross-examined by the prosecutor:

> Crawford: [T]he door's open, and he's coming out to do me harm, in my mind, because . . . I'm outside trying to get away, [and] he [had] just done me harm, [and] he's coming to do it again. Yes. I fired in his direction,

> and I never consciously acquired him as a target [or] actually saw that happen. I know he was coming at me, and I know I shot in his direction.

> For these reasons, we agree with the trial judge that the evidence at Crawford's trial did not support a jury instruction on defense of others.

*Crawford I*, 337 P.3d at 26-27.

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

There exists some support for Crawford's contention that the trial court erred in failing to give a defense of others instruction. *See United States v. Sanchez-Lima*, 161 F.3d 545, 549 (9th Cir.1998) (holding that a defendant is entitled to a jury instruction on a defense theory if "there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility"); *United States v. Streit*, 962 F.2d 894, 898 (9th Cir.1992). But even assuming, without deciding, that the omission was error, Crawford fails to show that the error rises to the level of a due process violation. *See Mitchell v. Newland*, 46 F. App'x 397, 399-400 (9th Cir. 2002). The Supreme Court has held that, as a matter of federal criminal procedure, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63(1988). But, for the reasons thoroughly and persuasively explained by the Court of Appeals, Crawford fails to show here that sufficient evidence existed for a reasonable jury to find that he shot the victim in the defense of others. In light of the facts of this case, and the trial court's instruction about the law of self-defense, any failure to give a defense of others instruction did not "so infect[] the entire trial that the resulting conviction violates due process." *Mitchell*, 46 F. App'x at 400 (quoting *Cupp*, 414 U.S. at 146-47). Crawford is therefore not entitled to relief on this ground.

   5.   *Funds for Indigent Defense* (Ground 7)

Finally, Crawford claims that the Alaska state courts' decision that the trial court was not required to provide Crawford public funds to hire various witnesses is an unreasonable application of, and contrary to, clearly-established authority of the U.S. Supreme Court. Crawford raised this claim in his initial appeal to the Alaska Court of Appeals. Because the claim presented an issue of first impression in Alaska and its adjudication would affect other criminal defendants, the appellate court asked for supplemental briefing from the parties as well as the Alaska Public Defender Agency and the Office of Public Advocacy, and appointed independent counsel to argue the issue on Crawford's behalf. *Crawford I*, 339 P.3d at 38-42. The Court of Appeals subsequently rejected Crawford's claim in a later published decision as follows:

> During the pre-trial proceedings in this case, there were numerous discussions—both in pleadings and in court hearings—as to whether Crawford could secure public funds to hire investigators and experts. As we have explained, Crawford took the position that he had a constitutional right to obtain public funds to purchase any defense services that a reasonable private attorney would purchase if the attorney's client had the means to pay for these services. But though the Supreme Court held in *Ake v. Oklahoma* that indigent criminal defendants have a right to obtain the services of certain experts at public expense, Crawford's formulation of this right is too broad.
> Given a sufficiently wealthy client, there are many avenues of investigation and expert analysis that a reasonable attorney might pursue. As this Court observed in *State v. Jones*,
>
> > If given an unrestricted budget and freed of any constraints as to probable materiality or accountability, a lawyer might . . . cheerfully log[ ] in many hours looking for the legal equivalent of a needle in a haystack. . . . [A] millionaire might . . . retain[ ] counsel to leave not a single stone unturned. However, a defendant is not entitled to perfection but to basic fairness. In the real word, expenditure of time and effort is dependent on a reasonable indication of materiality.
>
> 759 P.2d 558, 572 (Alaska App. 1988) (quoting *United States v. Decoster*, 624 F.2d 196, 211 (D.C. Cir. 1976) (en banc)).
>
> The true test for whether an indigent defendant is entitled to public funds to hire an expert is the test set forth in *Ake v. Oklahoma* and in *Caldwell v. Mississippi*: whether the defendant has shown that the proposed expert analysis will be a significant component of the defense case.[FN9]
> Although Crawford spoke repeatedly of his desire to consult various types of experts, there was only one instance where he offered a concrete reason why he wanted to retain a particular expert. This was in early November 2009, when Crawford explained to Judge Aarseth why he wanted to conduct additional DNA testing of the victim's fingernails. After hearing Crawford's explanation, Judge Aarseth ruled that a

-30-

reasonable attorney would not pay for Crawford's proposed DNA testing—a conclusion that we agree with, and a conclusion that Crawford has not appealed.

None of Crawford's other requests for expert witnesses were supported by a description of what, precisely, Crawford hoped to obtain from these experts' analyses, or how the proposed analyses would be significant components of Crawford's defense case.

We note, in particular, that Crawford never informed the superior court of the theory he asserts now on appeal: that the victim strangled him and that, because of this purported strangulation, Crawford was not only rendered semi-conscious or unconscious for a time, but also, upon regaining consciousness, Crawford's ability to perceive reality was impaired to the point where he mistakenly believed that the victim was attacking him with deadly force.

It is no doubt true, as both Crawford and his standby counsel asserted, that it was essentially impossible for Crawford to hire an expert without having money in hand. But the Supreme Court's rulings in *Ake v. Oklahoma* and in *Caldwell v. Mississippi* do not require the government to supply money directly to indigent defendants so that these defendants can hire their own experts. This matter is expressly addressed in Ake:

> [We do not] say . . . that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent [expert in the appropriate field], and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

470 U.S. at 83, 105 S.Ct. at 1096.

Thus, *Ake* does not guarantee indigent defendants an expert of their choosing—only that indigent defendants must be supplied an expert who is qualified to conduct the type of analysis that the defendant has shown to be a significant component of the defense case.

In other words, *Ake* and *Caldwell* presuppose that the government need not supply money to hire experts for an indigent defendant unless and until the defendant affirmatively demonstrates a significant need for the proposed type of expert analysis. The defendant must first explain the significance of, and the need for, a particular type of expert analysis, and then money will be authorized so that the defendant can receive the services of a qualified expert in that field.

Crawford never made this showing. Accordingly, the superior court committed no error when it declined to provide public funds for the various expert witnesses that Crawford mentioned.

*Crawford II*, 404 P.3d at 214-16.

The Supreme Court "has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985). As such, "[a] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Id.* at 77. In that context, the Supreme Court has held that a

-31-

defendant has a constitutional right to the appointment of a psychiatrist when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id.* at 83; *Williams v. Stewart*, 441 F.3d 1030, 1048 (9th Cir. 2006).

As the Ninth Circuit has explained, however, the Supreme Court has never held that indigent defendants are entitled to funds for other types of expert witnesses.[3] *Shroeder v. Premo*, 712 F. App'x 634, 363-37 (9th Cir. 2017); *see Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) ("We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to [a criminal investigator, a fingerprint expert, or a ballistics expert].").  Moreover, the Ninth Circuit has limited *Ake* to psychiatrists, concluding that it does not extend to eyewitness identification experts.  *See Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990) ("No issue was presented to the Supreme Court in *Ake* concerning the right of an indigent to the appointment of an expert on eyewitness identification.").  Lacking any clearly established Supreme Court authority requiring that other experts be provided, it cannot be concluded that the Alaska Court of Appeals' ruling in this case contravened or unreasonably applied *Ake*.  *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable).

---

[3]     Indeed, even assuming that *Ake* applies to non-psychiatric experts, the proper test under *Ake* is whether the defendant has shown that appointment of the expert is necessary to address a disputed issue. 470 U.S. at 74.  Here, the Court of Appeals reasonably determined that Crawford raised a concrete and case-specific allegation of need only with respect to his request for a DNA expert, which the trial judge determined—and the Court of Appeals agreed—was not reasonable.  *Crawford II*, 404 P.3d at 215.  "None of Crawford's other requests for expert witnesses were supported by a description of what, precisely, Crawford hoped to obtain from these experts' analyses, or how the proposed analyses would be significant components of Crawford's defense case." *Id.*  Accordingly, it cannot be said that the Court of Appeals' determination is contrary to *Ake* in any event.  *See Caldwell*, 472 U.S. at 323 n.1 (no deprivation of due process where "petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial").

-32-

Nor can it be said that Crawford's status as a self-represented indigent litigant required the State to provide the various experts requested.[4] Under *Faretta v. California*, 422 U.S. 806 (1975), a criminal defendant has a constitutional right to present his own defense without the assistance of counsel. The *Faretta* right to self-representation, however, does not encompass a corresponding right to ancillary services such as investigative or paralegal assistance. *Cf. Kane v. Garcia Espitia*, 546 U.S. 9, (2005) ("[A]s it is clear that *Faretta* says nothing about any specific legal aid that the State owes a pro se criminal defendant . . . the court below therefore erred in holding, based on *Faretta*, that a violation of a law library access right is a basis for federal habeas relief.").

The Ninth Circuit Court of Appeals has posited two views about a somewhat analogous situation—the appointment of an investigator. In *Williams v. Stewart*, 441 F.3d 1030, 1053 (9th Cir. 2006), the appellate court noted that in "appropriate circumstances" a court must provide an investigator to effectuate a defendant's right to the effective assistance of counsel. The Ninth Circuit nonetheless denied habeas review, agreeing that the petitioner "did not meet his burden of making a threshold showing that an additional investigator would be helpful." *Id.* at 1054. In *United States v. Wilson*, 690 F.2d 1267, 1271 (9th Cir. 1982), however, the Ninth Circuit found a Sixth Amendment right to self-representation did not include "further rights to materials, facilities, or investigative or educational resources that might aid self-representation." The Supreme Court adopted this latter view in *Kane v. Garcia-Espitia*, cited above.

But even if it could be said that the right to self-representation encompasses a corresponding due process right to certain ancillary services, the Ninth Circuit recognized in *Williams* that the provision of such services is "constitutionally necessary" only when such

_____

[4]     Notably, the trial judge initially told Crawford that he could request funding for a specific expert or service under Alaska Administrative Rule 12(e). Another trial judge, newly-assigned to the case, subsequently ruled that Crawford was not entitled to public funds for expert witnesses unless he accepted appointed counsel. Crawford challenged that ruling on appeal, and again challenges it here, but he does not argue here, and never alleged before the state courts, that his waiver of the right to counsel under *Faretta* was rendered unknowing or involuntary based on the change in ruling.

-33-

services are "required." 441 F.3d at 1053. Here, the Alaska Court of Appeals reasonably concluded that Crawford presented only conclusory statements to show that the requested experts were constitutionally necessary. *Crawford II*, 404 P.3d at 215. Accordingly, Crawford is not entitled to relief on this ground in any event.

B.      *Request for an Evidentiary Hearing*

In his Petition, Crawford requests that the Court "[c]onduct a hearing at which proof may be offered concerning the allegations in this petition and any affirmative defenses raised by the respondents." Crawford specifically requests that the Court hold an evidentiary hearing on Ground 7—the state courts' denial of public funding for expert witnesses.

A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963). *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005). In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material

-34-

facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 670 (quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superseded by statute as stated in Williams v. Taylor*, 529 U.S. 420 (2000).

As discussed above, Crawford has failed to assert a colorable claim for relief with respect to his denial of public funding claim. *See Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding an evidentiary hearing is not required on issues which can be resolved on the basis of the state court record). Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts with respect to this claim, he has also failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2), and he is not entitled to an evidentiary hearing in this Court.

## V. CONCLUSION AND ORDER

Crawford is not entitled to relief on any ground raised in his Petition, nor is he entitled to an evidentiary hearing.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 21, 2021.

s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge
